IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                              No. CR 01-13 MV

JAMES GREGORY FISHER,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's Motions to Suppress Evidence and Statements filed March 29, 2001 **[Doc. No. 17]** and Defendant's Motion to Bifurcate Suppression Hearing, filed May 17, 2001 **[Doc. No. 21]**.  A hearing was held on this matter on May 25, 2001 and May 29, 2001.  The Court, having considered the motion, response, reply, testimony of witnesses, argument of counsel and being otherwise fully informed, finds that the motion to suppress is well-taken and will be **granted**; and the motion to bifurcate the suppression hearing is **denied as moot.**

## FACTUAL BACKGROUND

On July 17, 2000, at about 11:15 in the morning, Sergeant Gonzales (who at the time was Deputy Gonzales), driving a Bernalillo County Sheriff's Department marked patrol car, noticed a small pickup truck parked next to a public BMX bicycle park.  The truck was parallel parked on a dirt road, approximately ten feet from the exterior of the fence that surrounded the park.

1

Sergeant Gonzales noticed two people in the truck and that the passenger was bending over.  The car was stopped; the keys were not in the ignition.  Sergeant Gonzales pulled behind the truck, turned on his emergency lights and approached the truck from the driver's side.  He was in uniform; he was armed.  Mr. Tyler Hibner was in the driver's seat; Mr. Fisher was in the passenger's seat.

Sergeant Gonzales asked Mr. Hibner and Mr. Fisher a series of questions.  He first asked them why they were at the park.  Mr. Fisher truthfully answered that they were waiting for someone who was going to show Mr. Hibner a BMX bike.  Sergeant Gonzales then asked them who that person was.  Mr. Fisher did not know his name, as it was Mr. Hibner who had arranged to meet the person.  But Mr. Fisher knew that the person was going to be coming from Paseo, so he pointed in that direction.  Sergeant Gonzales repeated these questions a couple of times, thinking their answers insufficient.  He then peered into the car, looked at the boys, and asked why their eyes were red and glassy.  Mr. Fisher answered that it was hot and he was tired.  Mr. Hibner said the same.  Sergeant Gonzales asked them if they were under the influence of drugs or alcohol.  They answered that they were not.  Mr. Fisher testified that after approximately ten to fifteen minutes, Sergeant Gonzales asked the boys for their drivers' licenses.  Sergeant Gonzales testified that although the first questions he asked the boys were about why they were at the park, who they were meeting, etc., it was less than a minute from when he first approached the vehicle to when he asked for their licenses.

Neither Mr. Fisher nor Mr. Hibner had a driver's license.  Sergeant Gonzales asked them for their names and social security numbers.  Mr. Fisher testified that Sergeant Gonzales obtained this information from them quickly and then reiterated the same questions about why they were at

2

the park.  Mr. Fisher testified that he then asked Sergeant Gonzales if they could leave.

Mr. Fisher ultimately asked to leave four times during the encounter.  Sergeant Gonzales

confirmed that he first asked the boys about why they were at the park, who they were meeting,

where he was coming from, why their eyes were red and glassy, and then asked Mr. Hibner and

Mr. Fisher for their identification.  Sergeant Gonzales testified that he also told Mr. Fisher that

they would be allowed to leave once he finished getting Mr. Hibner's personal information.  Mr.

Fisher testified that this was not true; Sergeant Gonzales had already obtained their information.

Both confirm that Sergeant Gonzales did not directly answer Mr. Fisher's requests to

leave.  After Mr. Fisher requested to leave the first time, he testified that Sergeant Gonzales

continued to question the boys about why they were at the park.  Mr. Fisher asked again if they

could leave.  Again, Sergeant Gonzales did not answer Mr. Fisher but continued questioning the

boys.  Mr. Fisher testified that Sergeant Gonzales was asking so many questions and talking so

much that it was difficult for him to find an appropriate time to interrupt Sergeant Gonzales in

order to ask if they could leave.  Mr. Fisher testified that he waited approximately fifteen minutes

before he first asked if they could leave.  After the third time Mr. Fisher asked, Sergeant

Gonzales, in a raised voice, told him to be quiet or else he would place Mr. Fisher outside the car

and on his knees.  Sergeant Gonzales confirmed that after a couple of times that Mr. Fisher asked

to leave, he told Mr. Fisher that he would place him on his knees if he did not be quiet.  Mr.

Fisher asked a fourth time, and Sergeant Gonzales ordered Mr. Fisher outside the car, to get on

his knees, and to put his hands on his head where the Sergeant could see them.

Mr. Fisher complied.  Mr. Fisher testified that after he stepped out of the car, he went to

close the passenger's door.  Sergeant Gonzales told him, "No," just to get to the front of the

truck.  Mr. Fisher complied and left the door open.  Sergeant Gonzales went over to the

passenger side and looked into the vehicle.  Mr. Fisher could see that the Sergeant bent down to

look into the vehicle because his head was no longer visible in the window for a period of time.

Sergeant Gonzales testified that after he ordered Mr. Fisher out of the vehicle, he finished getting

Mr. Hibner's identification information.  He testified that he went over to the passenger side to

shut the door for his safety; Mr. Fisher started to approach the door; and Sergeant Gonzales told

him to move away or else he would put Mr. Fisher on his knees.

There is a dispute about how Sergeant Gonzales found the gun in the vehicle.  Sergeant

Gonzales testified that while on the passenger side, he quickly glanced into the passenger

compartment.  When he did so, he saw the butt of a shotgun, which he could tell was shortened,

partially wrapped in a towel, placed vertically in front of the seat, in plain view.  Mr. Fisher

testified that the gun was entirely wrapped in a towel, covered with shirts, and was placed

horizontally and completely under the seat.  While Mr. Fisher was in the front of his car, on his

knees, with his hands behind his head, Mr. Fisher testified that Sergeant Gonzales asked "what is

this?".  Mr. Fisher answered that it was a gun.  Sergeant Gonzales then asked, "whose is it?".

Sergeant Gonzales testified that he asked "whose is this?".  Both agree that Fisher answered that

it was a friend of his father's, and that he was refurbishing it for him.

Sergeant Gonzales reached into the car and picked up the shotgun.  He examined it and

suspected that it was an illegal firearm because it appeared shorter than a standard shotgun.  At

this point, the Sergeant ordered Mr. Hibner out of the vehicle and to go to the front of the car

next to Mr. Fisher and to get on his knees.  The Sergeant stated that the boys were not under

arrest but were being detained until he could determine whether the firearm was illegal.  Sergeant

4

Gonzales put handcuffs on Mr. Fisher and placed him in the patrol car.

Sergeant Gonzales called for backup. Sergeant Smith arrived, then Deputy Ford, then Deputy Blefford, then Agent Jessen of the Bureau of Alcohol Tobacco and Firearms ("ATF"), who arrived 45 minutes after he was called. Agent Jessen questioned Mr. Fisher. Although Agent Jessen testified that he read Mr. Fisher his Miranda rights, he did not secure a written waiver. However, Agent Jessen did record the conversation. Mr. Fisher was crying as he spoke to Agent Jessen. Mr. Fisher told Agent Jessen what he told Sergeant Gonzales: that the gun belonged to a friend of his father's and that he was refurbishing it. A subsequent search of the backpack at the foot of the passenger seat revealed a marijuana pipe. Mr. Fisher told Agent Jessen and testified at the hearing that the backpack belonged to his friend, Anthony, who had been in the car just before they went to the park.

## DISCUSSION

Mr. Fisher seeks to preclude the Government from using at trial any evidence or statements obtained by law enforcement officers as a result of their allegedly illegal apprehension and detention of him. In order to decide this motion, the Court must first review the sequence of events and the circumstances accompanying the encounter between the law enforcement officers and Mr. Fisher to determine whether the encounter was a voluntary encounter, a *Terry*-type detention or a full-blown arrest. Second, the Court must decide whether the officers had the requisite specific and articulable facts at each stage of the encounter to justify their actions in apprehending and detaining Defendant. Finally, if the character of detention at any point was not justified, the Court must evaluate whether the illegal detention tainted subsequent evidence or

statements obtained by the officers to a degree requiring suppression.  As an initial matter, the Court will deal with Mr. Fisher's standing as a passenger to contest his detention and subsequent search.

## I.      Standing

The Government claims that Mr. Fisher does not have standing to challenge the search of the vehicle.  While it is true that a passenger does not have standing unless he has some legitimate expectation of privacy in the vehicle or the evidence seized, a passenger does have standing to "challenge a constitutionally improper traffic stop, detention, or arrest on Fourth Amendment grounds even though, when the seizure occurs, she has no possessory or ownership interest in either the vehicle in which she is riding or in its contents."  *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164 (10th Cir. 1995); *see also United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989) ("It is beyond dispute that a vehicle's driver may challenge his traffic stop, and we see no reason why a person's Fourth Amendment interests in challenging his own seizure should be diminished merely because he was a passenger, and not the driver, when the stop occurred."). The Tenth Circuit "distinguish[es] passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest." *Id.* at 1162.  If the physical evidence found in the vehicles was the fruit of the defendants' unlawful detention, it must be suppressed.  *Id.* at 1162-64; *United States v. Miller*, 84 F.3d 1244, 1250 (10th Cir. 1996).  This requires a two-part inquiry: first, whether the defendants were unlawfully detained, and second, whether the discovered evidence was the fruit of that unlawful detention.  *Miller*, 84 F.3d at 1250.  Only if both of those questions

are answered in the affirmative will the physical evidence found in the vehicles be suppressed.  *See*

*United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996).

## II.  Character of the Encounter

Encounters between law enforcement officers and citizens fall into three categories:

1) voluntary encounters, in which a citizen freely cooperates and responds to noncoercive

questioning from officers; 2) *Terry* stops, which are typically brief, nonintrusive detentions during

which officers ask preliminary investigative questions and may even frisk a citizen for weapons if

necessary for their safety; and 3) arrests, which usually occur when a detention or search becomes

lengthy or highly intrusive.  *United States v. Griffin,* 7 F.3d 1512, 1516 (10th Cir. 1993).

Officer/citizen interactions are not static events, but often progress through the categories of

encounters as the intrusiveness or length of the police activity increases.  The Government argues

that this was a consensual encounter which need not be justified by any degree of suspicion.  Mr.

Fisher argues that this was a seizure requiring reasonable suspicion or probable cause.

By Sergeant Gonzales' version of events, he engaged his emergency lights, walked up to

the driver's side of the car, asked the boys a few questions about why they were at the park, and

then, within less than a minute, asked the boys for identification.  When he discovered that

Mr. Hibner did not have a driver's license, the Government asserts that he had probable cause to

believe that the crime of driving without a license had just occurred or was about to occur.

Sergeant Gonzales testified that the remainder of the conversation took place while he was

attempting to obtain Mr. Hibner's information.  Sergeant Gonzales stated this was difficult

because Mr. Fisher kept interrupting him with requests to leave.  The Government argues that the

encounter was consensual, and that probable cause to continue detaining Mr. Fisher and Mr. Hibner developed during the course of the stop.

However, by Mr. Fisher's version of events, Sergeant Gonzales engaged his emergency lights just as the boys were about to exit the car, walked up to Mr. Hibner's side of the car and immediately began asking questions about why they were at the park, whom they were going to meet, etc. Mr. Fisher stated that Sergeant Gonzales asked these questions repeatedly because he did not seem satisfied with their answers. After about ten to fifteen minutes, Sergeant Gonzales asked for their identification. Although Mr. Hibner did not have a driver's license, Sergeant Gonzales was able to obtain his identifying information. Mr. Fisher testified that Sergeant Gonzales continued questioning the boys after he obtained their information, and that once Mr. Fisher realized that Sergeant Gonzales was asking the same questions again, he began to ask if they could leave.

The Court will first discuss why it finds Mr. Fisher to have been more credible than Sergeant Gonzales. It will then discuss why, based upon Mr. Fisher's recantation, this was a seizure requiring a minimum of reasonable suspicion rather than a consensual encounter.

**A.      Credibility**

The Government's contention that this was a consensual encounter is based entirely upon Sergeant Gonzales' version of events. Sergeant Gonzales testified that he saw the truck parked next to the BMX bike park while he was on routine patrol. He pulled up behind the truck and engaged his emergency lights. He stated that he went to the driver's side of the car and asked the boys what they were doing at the park. According to Sergeant Gonzales, within less than a

8

minute, he asked the boys for their identification.  Mr. Hibner did not have a drivers' license.

Sergeant Gonzales testified that the remainder of the conversation occurred while he was

attempting to obtain Mr. Hibner's information in order to run a license and warrants check.

Mr. Fisher gave a different version of events, as recounted above.  The Court credits Mr. Fisher's

version.

Sergeant Gonzales testified that he approached the car because:  Mr. Fisher and

Mr. Hibner were parallel parked outside a BMX bike park, whereas usually cars parked

perpendicular to the curb; he could not see a bike in their pickup truck; Mr. Fisher was hunched

over in the passenger seat; and they were adults at a park that contained mostly children.  The

Court finds that Sergeant Gonzales' stated justifications for approaching the truck are not

credible.  His testimony was ever-changing, and none of these justifications were supported by his

actions taken at the time of the stop nor by sufficient facts articulated at the hearing.  In addition,

most of these justifications were not indicated in the reports he filed.  The Court will highlight a

few examples from Sergeant Gonzales' testimony.

Sergeant Gonzales stated that he suspected Mr. Fisher and Mr. Hibner of being in a

dispute or of needing medical attention.  As evidence of this, Sergeant Gonzales stated that as he

was driving by, he saw that Mr. Fisher was "hunched over" in the passenger seat.[1]   However,

Sergeant Gonzales did not ask any questions relating to a dispute or their medical condition when

he approached the vehicle.  Nor did he ask Mr. Fisher why he was hunched over or what was

---

[1]  Sergeant Gonzales also added that he thought that Mr. Fisher must have been hiding something under the seat
when he did this, although he did not testify that he saw anything in Mr. Fisher's hands.  Indeed, Sergeant
Gonzales admitted on cross examination that he could not see into the truck because there were many decals on the
back windshield, and that he was unable to make any detailed observation.

under the seat.

Sergeant Gonzales also contended that he approached the vehicle because it was blocking the entrance to the park, it was parked parallel to the fence rather than perpendicular and that there were no bikes in Mr. Hibner's truck.  With respect to the contention that the truck was blocking the entrance to the park, Sergeant Gonzales stated that the truck was ten feet from the fence and that bikes could get in and out of the park.  Thus his own testimony belied his contention that the truck blocked access to the park.  Moreover, if he was truly concerned that the vehicle was blocking the entrance, he could have asked the boys to move their truck.  He did not do so.  The fact that the car was parked parallel to the fence is of no consequence.  There were no other cars parked in that area; there were no signs or markings in the road to indicate how one was supposed to park.  Therefore, the "correct" way to park their car would not have been known to Mr. Fisher or Mr. Hibner.  Nor did Sergeant Gonzales indicate how this was suspicious, or what criminal activity this indicated.  Finally, as to his assertion that he could not see any bikes in the truck, Sergeant Gonzales not directly ask any questions to dispel this suspicion.  However, in response to why they were at the park, the boys answered that they were waiting for a friend who was going to show them a bike.  This explained why they did not have a bike with them.

Sergeant Gonzales also stated that he thought it was suspicious that they were adults in the park because only children used the park.  Throughout the testimony Mr. Fisher was referred to as an adult who appeared "out of place" at the BMX park.  This is disingenuous.  While no testimony was presented about the appearance of Mr. Hibner, the Court takes judicial notice that Mr. Fisher, although 21 years old, is small in stature and has a very young appearance.  The Court

takes notice that Mr. Fisher appears to be 16 years old and does not at all look as though he would be out of place at a BMX park.  Further, Mr. Fisher stated that in fact there was an adult at the park, who also did not have a bike.  Therefore, either Sergeant Gonzales was not truthful in reporting that Mr. Fisher and Mr. Hibner were the only adults at the park, or he boldly stated that they were the only adults at the park without having fully observed the rest of the park.  Therefore, the Court finds this justification specious.

Further, the Court finds that Sergeant Gonzales' testimony that the gun was in plain view is not credible.  Sergeant Gonzales testified that after he ordered Mr. Fisher out of the truck, he went to close the passenger door for his safety.  He stated that when he got to the passenger's side, he looked into the truck and saw the butt of a sawed-off shotgun in front of the passenger's seat, placed vertically under the seat, partially wrapped in a towel.  He testified that "from his training," he knew that the gun was illegal.  Mr. Fisher testified differently.  He stated that after Sergeant Gonzales ordered him out of the car, he was about to close the passenger door when Sergeant Gonzales told him not to, just to get on his knees.  From where he was positioned, Mr. Fisher stated that he saw Sergeant Gonzales lean down into the car.  Sergeant Gonzales asked, "What's under there?"  Mr. Fisher told him it was a gun.  He then asked, "Whose is it?"  Mr. Fisher replied that it was a friend of his father's.  Mr. Fisher testified that just before Sergeant Gonzales stopped them, he had just put his clothes and the gun away.  He stated that the gun was completely wrapped in the towel, was placed horizontally and completely under the seat, not vertically and partially sticking out as Sergeant Gonzales claimed.

The Court finds that Sergeant Gonzales did not see the shotgun in plain view.  Mr. Fisher's testimony, which this Court credits, indicates that the gun was not in plain view, but was

11

hidden under the seat.  Moreover, by having to ask, "What's under there?", the gun could not have been in plain view.  Moreover, the Court finds that the incriminating nature of the shotgun was not immediately apparent.  Even accepting Sergeant Gonzales' testimony, all he saw was the butt of the shotgun.  There was testimony by Sergeant Gonzales, Sergeant Smith and Agent Jessen that a shotgun is illegal if the barrel is short.  Sergeant Gonzales could not see the barrel; he only saw the butt, and testified that the remainder of the shotgun was wrapped under a towel. Sergeant Gonzales would not have immediately known that the shotgun was illegal.

Finally, in assessing Sergeant Gonzales' credibility, the Court also notes that Sergeant Gonzales' responses during his testimony were not simple answers to questions posed, as would be the case with a neutral witness simply recounting the events that happened on a particular day. Rather, his answers sought to legally justify his conduct.  For example, when Sergeant Gonzales was asked on cross examination about why he responded to Mr. Fisher's requests to leave with an order that if Mr. Fisher did not stop asking him to leave, Mr. Fisher would be ordered out of the car and onto his knees, Sergeant Gonzales stated that he did this "for his safety."  The question, however, was not why he threatened to order Mr. Fisher out of the car, but why he did not answer Mr. Fisher when he asked to leave.  Sergeant Gonzales' answer was not responsive to the question, and simply sought to justify his conduct.[2]

Additionally, with every question on cross examination, he did not simply answer defense counsel's questions.  He seemed to feel compelled to defend his actions, adding the appropriate,

---

[2]  The Court notes also that Sergeant Gonzales' contention that he threatened to order Mr. Fisher out of the truck for his safety, if true, does not answer why he could not have simply answered Mr. Fisher and told him that he was allowed to leave.  Both would have gotten Mr. Fisher away from Sergeant Gonzales.  However, the approach Sergeant Gonzales took was one that kept Mr. Fisher under his coercive authority, and definitively signaled that Mr. Fisher was not free to leave.

and out-of-context, phrases he thought necessary to explain his actions.  He would not a concede a point to defense counsel without an attempt to justify his conduct on that day or his previous answers during his testimony, even when the points were not consequential.  For example, Sergeant Gonzales stated that once he approached the truck, he noticed that their eyes were bloodshot and glassy.  He asked them if they were under the influence of any drugs or alcohol. They replied they were not.  On cross examination he stated that this was one of his reasons for further detaining the boys, yet he also admitted that he did not detect an odor of marijuana or alcohol during the contact and that their speech was not slurred.  When defense counsel tried to offer an innocent explanation for bloodshot or glassy eyes; that it is often windy and dusty in New Mexico, Sergeant Gonzales immediately retorted that it was not windy or dusty that day.  How Sergeant Gonzales remembers whether it was windy or not on July 17, 2000, almost a year previously, is beyond the Court's imagination.  The Court does not credit Sergeant Gonzales' response.  With all due respect to Sergeant Gonzales, the Court must note that rather than simply having provided the facts, Sergeant Gonzales advocated the Government's position on the stand. Therefore, the Court finds that Sergeant Gonzales was not a credible witness.

In contrast, notwithstanding the Government's opinion, the Court finds that Mr. Fisher was a credible witness.  He was straightforward in his answers; answered questions directly; did not hesitate in his responses and did not add unnecessary justifications for his conduct that would give the Court the impression that he was merely telling a self-serving story rather than relating the events in question.  Mr. Fisher was also forthright with information that was not helpful to him.  For example, he admitted that he was not certain whether he asked Sergeant Gonzales "Can *we* leave?" or "Can *I* leave?" (emphasis added).  He also admitted to having shot the shotgun

13

once.

The Government's arguments as to why Mr. Fisher is not a credible witness are not persuasive. While the Government points to a possible discrepancy in Mr. Fisher's testimony from that of Mr. Hibner regarding the sale of the BMX bike, there is no evidence to suggest that it was Mr. Fisher who was not telling the truth rather than Mr. Hibner. The discrepancy was that Mr. Fisher stated that Mr. Hibner told him that he was going to buy a bike that day, and that they were going to meet the seller at the BMX bike park, whereas Agent Jessen reported that Mr. Hibner told him he had already bought a new bike and they were at the park to try it out. The Court is not persuaded by the Government's argument. It is clear that there was no BMX bike in Mr. Hibner's truck. Therefore, they were in fact waiting for someone to deliver a BMX bike to the park. Whether Mr. Hibner already purchased the bike, and whether Mr. Fisher would have known this, is not consequential. Further, no evidence was presented as to the questions asked to Mr. Hibner; therefore, it is difficult to even conclude that there was a discrepancy, rather than two different answers being given to two different questions.

With respect to whether Mr. Fisher was able to see Sergeant Gonzales crouch down inside the truck, the Court finds that the Government is again looking for a discrepancy where none can be found. The Court finds that Mr. Fisher was in fact not on his knees, but was standing when Sergeant Gonzales first approached the truck. Mr. Fisher testified that Sergeant Gonzales ordered him to get out of the car, get on his knees and put his hands on his head. Before Mr. Fisher did that, however, he went to close the passenger door. At that point, before he was on his knees, Sergeant Gonzales told him "No," then came over to the passenger side. Sergeant Gonzales' testimony confirmed that Mr. Fisher was not on his knees when he approached the

14

passenger door.  Sergeant Gonzales testified that when he approached the passenger door, he told

Mr. Fisher to back away or else he would order him to get on his knees, thus implying that Mr.

Fisher was still standing.  Sergeant Gonzales also testified that after he discovered the gun, he

ordered Mr. Hibner out of the car, and then ordered Mr. Hibner and Mr. Fisher on their knees,

again implying that Mr. Fisher had not yet been on his knees.  Therefore, it is not clear from

evaluating even Sergeant Gonzales' testimony whether Mr. Fisher was on his knees or standing

when Sergeant Gonzales looked into the truck.  Even reconciling the testimony to the

Government's advantage, at the very least Mr. Fisher would have had an opportunity to see

Sergeant Gonzales peer into the truck while he was still standing.  Once he was on his knees, he

would have been able to see that Sergeant Gonzales crouched down (by no longer seeing him

through the window, it is logical to infer that Sergeant Gonzales crouched down).  Mr. Fisher

stated that although he was on his knees, he was not directly in front of the truck, but could see

Sergeant Gonzales through the window.  Therefore, Mr. Fisher's testimony was not entirely

incorrect.  Nonetheless, even if the Court assumes this discrepancy, this one mistake in Mr.

Fisher's entire testimony is not enough for the Court to find as a whole that Mr. Fisher was not a

credible witness.

Therefore, the Court finds that as a whole, Mr. Fisher was a more credible witness.  As

such, the Court credits Mr. Fisher's version of the events on the day of the stop rather than

Sergeant Gonzales'.

## B.  Reasonable Suspicion Required

"[A] seizure does not occur simply because a police officer approaches an individual and

asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  However, a seizure does

occur when government actors have, 'by means of physical force or show of authority, ... in some

way restrained the liberty of a citizen.'"  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)

(quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  "[A] Fourth Amendment seizure ... occur[s]

... when there is a governmental termination of freedom of movement through means intentionally

applied."  *Brower v. Inyo County*, 489 U.S. 593, 596-97 (1989).   That means that for a seizure to

occur, a person must be stopped by the very instrumentality set in motion or put in place in order

to achieve that result.  *Id.* at 598-99.  Whether a seizure has occurred is a question of fact to be

determined from all the circumstances.  A court must consider all the circumstances surrounding

the encounter to determine whether the police conduct would have communicated to a reasonable

person that the person was not free to decline the officer's requests or otherwise terminate the

encounter.  *See Florida v. Bostick*, 501 U.S. 429, 439 (1991).

In this case, Sergeant Gonzales' conduct would have communicated to a reasonable

person that they were not free to decline his request to speak with them or otherwise terminate

the encounter.  The first action Sergeant Gonzales took was that he pulled behind the truck and

engaged his emergency lights.  When police flash their emergency lights, courts have found that

such conduct is evidence of a seizure.  *See Brown v. City of Oneonta*, 221 F.3d 329, 340-41 (2nd

Cir. 2000) (seizure occurred where officer pulled over automobile with flashing lights and siren);

*United States v. Cardoza*, 129 F.3d 6, 16 (1st Cir. 1997) (no seizure because officer did not turn

on flashing lights; officer simply called out to defendant and asked him a few questions); *United

States v. Chan-Jimenez*, 125 F.3d 1324 (9th Cir. 1997) (seizure occurred where officer pulled up

behind defendant; activated emergency lights; retained defendant's documents and had hand on

his gun); *United States v. Kim*, 25 F.3d 1426, 1430 n.10 (9th Cir. 1994) (no seizure when officer approached person in parked car, because officer did not engage his emergency lights and was not uniformed or armed); *United States v. Gonzalez*, 875 F.2d 875, 877 (D.C. Cir. 1989) (when Customs Service successfully stopped boat by means of flashing strobe light, it conducted seizure that triggered the protections of Fourth Amendment); *United States v. Adegbite*, 846 F.2d 834, 838 (2nd Cir. 1988) (seizure occurs with "abundant displays of authority, including police uniforms, sirens and flashing lights...."); *United States v. Bowles*, 625 F.2d 526, 532 (5th Cir. 1980) (because situation where detective passed individual who was walking down airport concourse, held out his credentials, and turned to face defendant, blocking his path and forcing him to stop was analogous to situation of traffic stop by means of flashing lights or sirens, seizure occurred.); *United States v. Morrison*, 546 F.2d 319, 320 (9th Cir. 1976) ("[w]hen a law enforcement officer signals a motorist to stop by use of a siren or red light, there has been a seizure which must be justified under the Fourth Amendment."); *cf. United States v. Perez-Sosa*, 164 F.3d 1082 (8th Cir. 1998) (although officer sought to stop defendant through a show of authority by flashing his lights, officer did not succeed, and defendant stopped by his own decision to refuel; therefore, encounter was consensual rather than seizure involving Fourth Amendment).

Further, the circumstances of this case indicate that the only reasonable interpretation of the emergency lights was that the occupants were not free to leave.   The vehicle was already parked.  Had Sergeant Gonzales simply wanted to ask the boys a few questions, he could have walked up to the car without engaging his lights.  However, by engaging his lights, he ensured that the boys did not leave the car or drive away.  Moreover, this encounter occurred on a dirt road near a public park; this is not the case where, on a busy highway, an officer may engage his

lights as a safety precaution to alert passing drivers to the fact that there are parked cars on the side of the road.

Additionally, Sergeant Gonzales' other conduct would have signaled to a reasonable person that they were not free to leave and that cooperation was required.  When Sergeant Gonzales walked up to the driver's side of the car, he immediately began asking incriminating questions of the boys.  He did not ask friendly questions pertaining to their health or well-being, but rather immediately began asking them incriminating questions about why they were parked at the park, the identity of the person who was selling them the bike, from which direction he was coming, why their eyes were bloodshot and glassy, and ultimately asked for their identification. *See United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996) ("'[A]ccusatory, persistent, and intrusive' questioning may turn an otherwise voluntary encounter into a coercive one if it conveys the message that compliance is required."); *United States v. Griffin,* 7 F.3d 1512, 1519 (10th Cir. 1993); *United States v. Bloom*, 975 F.2d 1447, 1454 (10th Cir. 1992); *United States v. Ward*, 961 F.2d 1526, 1534 (10th Cir. 1992).  The Court finds that this line of questioning did not last less than a minute, as Sergeant Gonzales contended.[3]  Judging from the number of questions, the fact that Sergeant Gonzales asked the questions of both boys, the time necessary for them to respond, and Mr. Fisher's credible estimate, the Court finds that these questions lasted at least ten minutes before Sergeant Gonzales asked for identification.  The Court also finds it significant that Sergeant Gonzales was in uniform and armed.  *See Bloom*, 975 F.2d at 1454.  Considering all of

---

[3]  The Court notes that Sergeant Gonzales initially stated that it was three or four minutes before he asked for their identification.  After he gave this response, the Government stated, "No," and repeated the question slowly. Sergeant Gonzales then corrected himself and stated that "oh, that was very – that wasn't even – not even a minute."

these factors, the Court finds that a reasonable person would not have felt free to leave or to ignore Sergeant Gonzales' questions. *See Adams v. Williams*, 407 U.S. 143, 147-48 (1972) (holding that surrounding circumstances are relevant in determining whether the requisite suspicion exists to warrant further investigation).

Further, Sergeant Gonzales' conduct would have communicated to a reasonable person in Mr. Fisher's situation, specifically, that he was not free to leave. As the cases regarding passenger standing, cited above, indicate, when an officer stops a vehicle he stops *all* occupants of the car, not just the driver. Moreover, in this case, Sergeant Gonzales' conduct was directed at both Mr. Hibner and Mr. Fisher, not just Mr. Hibner. When Sergeant Gonzales approached the vehicle, he asked both boys why their eyes were bloodshot and glassy. He asked both boys for information about why they were at the park. He also asked both boys for their identification, not just Mr. Hibner. Therefore, the Court specifically finds that Sergeant Gonzales' conduct as to Mr. Fisher would have communicated to a reasonable person in Mr. Fisher's situation that he was not free to leave.

As stated above, for a seizure to occur, it is not enough that an officer intended to effect a seizure; the suspect's freedom of movement must be terminated by the instrumentality set in place to effect the seizure. *See Brower*, 489 U.S. at 597; *see also California v. Hodari D.*, 499 U.S. 621 (1991) (holding that an arrest or seizure "requires either physical force ... or, where that is absent, submission to the assertion of authority"). The Court finds that Sergeant Gonzales' show of authority was successful; Mr. Fisher testified that just prior to being stopped by Sergeant Gonzales, the boys were about to exit the car. The reason they did not do so was in direct response to his emergency lights and in order to comply with his commands. Mr. Fisher testified

19

that he thought it was important to "cooperate" with the police; therefore, he did as he was commanded, not as he chose.  Mr. Fisher testified that when Sergeant Gonzales approached them, he assumed they had been stopped.  The Court finds Mr. Fisher's testimony credible.

Because the Court finds that this was a seizure requiring reasonable suspicion, Sergeant Gonzales must have had a "specific, articulable and objective factual basis" to believe that Mr. Fisher or Mr. Hibner was "engaged in criminal activity." *United States v. Davis*, 94 F.3d 1465, 1469-70 (10th Cir. 1996).  Sergeant Gonzales had at most a hunch of some inarticulable suspicion.  "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized ... hunch.  The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted).  Sergeant Gonzales did not have an objective justification for making the stop.  There was no reasonable suspicion justifying the stop.  Because there was no reasonable suspicion, Sergeant Gonzales' detention of Mr. Fisher was in violation of the Fourth Amendment.[4]

## III.  Remainder of the Stop

Because the initial detention was illegal, evidence obtained as a result of that illegal detention must be excluded to the extent it was the fruit of the poisonous tree.  *See United States v. Betancur*, 24 F.3d 73, 77 (10th Cir. 1994); *United States v. Arango*, 912 F.2d 441, 446

---

[4] The Government did not argue that Sergeant Gonzales was justified in stopping the truck in accordance with his "community caretaking function" *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) (citing *Cady v. Dombrowski*, 413 U.S. 433, 443 (1973).  In any event, because the Court finds that Sergeant Gonzales' stated justifications for stopping the truck were not credible, the Government cannot justify the stop on that ground.

(10th Cir. 1990).  As an initial matter, once the defendant has shown that the detention was

illegal, the defendant has the initial burden of showing "a factual nexus between the illegality and

the challenged evidence."  *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)

(citing *United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980)).  Once the defendant has

met this burden, the burden shifts to the Government to prove that the evidence was not the fruit

of the poisonous tree.  *Id.* (citations omitted).  That challenge can be met by showing the

discovery of the evidence was inevitable; it was discovered through independent means; or it was

so attenuated from the illegality that the taint is dissipated.  *Id.* (citations omitted).  To determine

whether evidence obtained  "has been come at by exploitation of [the] illegality or instead by

means sufficiently distinguishable to be purged of the primary taint" of the arrest, *Wong Sun*, 371

U.S. 471, 488 (1963) (quotation marks and citation omitted), courts apply the analysis set forth in

*Brown v. Illinois*, 422 U.S. 590 (1975).  *See, e.g., United States v. Gregory*, 79 F.3d 973

(10th Cir. 1996) (applying the test to find that consent did not purge taint of illegal stop); *United

States v. Boone*, 62 F.3d 323 (10th Cir. 1995) (applying the test to abandonment of evidence after

an illegal detention); *United States v. Miller,* 608 F.2d 1089 (5th Cir. 1979) (applying the test to

physical evidence).  While no single fact is dispositive, the Supreme Court in *Brown* identified

three factors relevant to determine whether statements that officers obtain as a result of an illegal

seizure are admissible:  1) the temporal proximity of the statements to the Fourth Amendment

violation; 2) the existence of intervening causes between the violation and the statements; and

3) the purpose or flagrancy of the official misconduct.  *See Brown* at 603-04.  With regard to

confessions, another relevant consideration is whether *Miranda* warnings were administered prior

to the defendant's statement.  *Id.* at 603.   The evidence that Mr. Fisher seeks to suppress is the

gun and his statements to Sergeant Gonzales and Agent Jessen.

## A.  The Gun

The Government contends that Mr. Fisher does not have standing to challenge the search of the truck.   As stated, above, although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.  *See United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (quoting *Shareef*, 100 F.3d at 1500; *Eylicio-Montoya*, 70 F.3d at 1162).  Mr. Fisher is challenging the search of the gun as a fruit of his illegal detention.  Therefore, Mr. Fisher may contest the search of the gun.

The Court finds that Mr. Fisher has met his burden of proving a sufficient factual nexus between the illegal stop and the gun.  Sergeant Gonzales was not justified in stopping the truck or detaining the boys to ask them incriminating questions, as discussed above.  Had he not illegally stopped and detained the boys, he would not have had occasion to order Mr. Fisher out of the car, go over the passenger's side, and observe the gun.  Sergeant Gonzales did not obtain access to the gun by any means other than through the illegal stop.

Because the Court finds that Mr. Fisher has met his burden of proving a factual nexus between the illegal stop and the discovery of the gun, the burden shifts to the Government to prove that the discovery of the gun is not the fruit of the poisonous tree.  Relying solely on the assumption that the stop was consensual, the Government has not argued that the gun is not the fruit of the poisonous tree; nor did it present any evidence at the hearing to address this burden.

22

On this basis alone, the Court should conclude that the gun should be suppressed as the fruit of the unlawful detention.

However, as this Court prefers to deal with issues on the merits, it will address the *Brown* factors to determine if the discovery of the gun "has been come at by exploitation of [the] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.   The three *Brown* factors indicate that the search came about by exploitation of the illegality.  With respect to the first factor, approximately twenty-five to thirty minutes elapsed between when Sergeant Gonzales first stopped the boys and when he discovered the gun.  However, the Court has found that Sergeant Gonzales' conduct during the stop, that of questioning the boys for ten minutes before he asked for their identification, contributed to the determination that it was unconstitutional; therefore, the time in fact is much less.  Even if the Court considers the time between when Sergeant Gonzales initially stopped the truck and when he discovered the gun, thirty minutes is not enough to dissipate the taint.  *See Taylor v. Alabama,* 457 U.S. 687 (1982) (confession six hours after illegal arrest not purged of taint of illegal arrest); *Dunaway v. New York,* 442 U.S. 200, 203 (1979) (incriminating statements made within an hour of illegal arrest not sufficiently attenuated); *Brown,* 422 U.S. at 604 (statement separated from illegal arrest by less than two hours not attenuated); *United States v. Maez*, 872 F.2d 1444, 1455 (10th Cir. 1989) (holding that 45 minutes between illegal seizure between illegal seizure and consent did not purge taint).

There were no intervening circumstances between the illegal detention and the discovery of the gun.  The entire encounter took place on the scene of the illegal detention, with nothing occurring but Sergeant Gonzales' questioning of Mr. Fisher and Mr. Hibner.  In *Brown*, where the

defendant was taken to the police station and questioned after the illegal arrest, the Supreme

Court found no "significant" intervening circumstance from the defendant's initial illegal arrest and

his eventual confession. *See Brown*, 422 U.S. at 604.   The Court contrasted the situation to

*Wong Sun*, where the confession, held admissible, came several days after the illegality, and was

preceded by a lawful arraignment and a release from custody on his own recognizance. *See*

*Brown*, 422 U.S. at 604 n.11 (citing *Wong Sun*, 371 U.S. at 491).  The Fifth Circuit has noted

that where physical evidence is discovered after an illegal detention, as opposed to when a

confession is extracted, courts tend to find that there were no intervening circumstances. *See*

*United States v. Cantu*, 230 F.3d 148, 159-60 (5th Cir. 2000) (citing *United States v. Ienco,* 182

F.3d 517, 528 (7th Cir. 1999) (formal arrest not an intervening circumstance sufficient to

attenuate discovery of incriminating evidence*); United States v. Miller,*146 F.3d 274, 280 (5th

Cir. 1998) (finding no intervening circumstances where initial stop led directly to search and

discovery of drugs in motor home); *United States v. King,* 990 F.2d  1552, 1564 (10th Cir. 1993)

(abandonment of drugs not an intervening circumstance); *United States v. Tookes,* 633 F.2d 712,

716 (5th Cir. Unit B 1980) (finding no intervening circumstance in defendant being placed in back

seat of police car and driven around the block before pistol was discovered).  Therefore, the

Court finds that the discovery of the gun did not come about by "an intervening independent act

of a free will" sufficient "to purge the primary taint of the unlawful invasion." *Wong Sun*, 371

U.S. at 486.

Finally, the Court finds that the purpose or flagrancy of the misconduct argues in favor of

suppression.  In *Brown*, the Supreme Court found that the police officers' conduct was purposeful

because "the detectives embarked upon this expedition for evidence in the hope that something

24

might turn up." *Brown*, 422 U.S. at 605.  As the Court stated above, it does not credit Sergeant

Gonzales' stated reasons for stopping the boys.  The testimony at the hearing showed that

Sergeant Gonzales had "little interest" in any of his professed concerns, and his questioning and

continued detention of the boys was "an improper fishing expedition in the hope that something

might turn up."  *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996) (citations omitted).

Sergeant Gonzales called in the vehicle as a "suspicious vehicle," and could not articulate at the

hearing what crime he was investigating.  Sergeant Gonzales detained the boys solely on a "vague

hunch that something was afoot," *see United States v. Fernandez*, 18 F.3d 874, 883 (10th Cir.

1994), rather than for reasonable suspicion or probable cause.  Therefore, the gun will be

suppressed.


### B.  Statements

Mr. Fisher seeks to suppress two sets of statements.  The first are the statements Mr.

Fisher made to Sergeant Gonzales; the second are the statements he made to Agent Jessen.  In

order to determine whether these statements should be suppressed, the Court first must determine

whether Mr. Fisher has established a factual nexus between the illegal detention and the

statements he seeks to suppress.  *See Nava-Ramirez*, 210 F.3d at 1131.  Then the Government

must show that the statements were not the fruit of the poisonous tree, analyzing the three factors

in *Brown*.

Mr. Fisher has established a factual nexus between the illegal detention and the statements

he made.  The statements both to Sergeant Gonzales and to Agent Jessen were made at the time

of and in the context of the illegal detention.  The statements to Sergeant Gonzales were made

while Mr. Fisher was on his knees with his hands over his head.  Mr. Fisher answered that the

item under the seat was a gun in direct response to Sergeant Gonzales' question, "What is this?".

He also answered that the gun belonged to a friend of his father's in direct response to Sergeant

Gonzales' question, "Whose is it?"  *Cf. United States v. King*, 222 F.3d 1280, 1286 (10th Cir.

2000) (no factual nexus in part because defendant's admission about the shotgun was not

prompted by an officer's question specifically concerning the shotgun).

Similarly, Mr. Fisher's statement to Agent Jessen, although it occurred later, was a result of the

illegal detention.  Sergeant Gonzales stated that once he found the gun, he ordered Mr. Hibner

out of the car and on his knees next to Mr. Fisher.  He stated that the boys were "detained" until

he could determine if the firearm was illegal.  Within a few minutes, two more officers arrived on

the scene.  By the time Agent Jessen arrived, Sergeant Gonzales had placed Mr. Fisher and Mr.

Hibner in the patrol car, in handcuffs.  Once Agent Jessen arrived, he inspected the gun,

Mirandized Mr. Fisher and then questioned him about the gun and the events that transpired that

day.  Mr. Fisher gave a statement to Agent Jessen in response to Agent Jessen's questioning.

Therefore, the Court finds there was a factual nexus between the initial illegal detention and Mr.

Fisher's statement to Agent Jessen.

Turning to the *Brown* factors, the Court finds that Mr. Fisher's statement to Sergeant

Gonzales were not sufficiently attenuated from the illegal detention so as to dissipate the taint.

The *Brown* analysis with respect to Mr. Fisher's statement to Sergeant Gonzales is identical to the

Court's analysis with respect to the gun, for Mr. Fisher's statement to Sergeant Gonzales

occurred as Sergeant Gonzales was discovering the gun.  The temporal proximity was not enough

to dissipate the taint, there were no significant intervening circumstances, and the statements were

the product of the same illegal detention.  Moreover, Sergeant Gonzales did not give Mr. Fisher

*Miranda* warnings.  Therefore, Mr. Fisher's statements to Sergeant Gonzales will be suppressed.

With respect to Mr. Fisher's statement to Agent Jessen, there are some differences.  Agent

Jessen read Mr. Fisher his *Miranda* rights before he questioned him, and the time lapse between

the initial detention and the statement was two hours.  With respect to the first factor, the Court

finds that in this case, two hours was not long enough to dissipate the taint.  *See Brown*, 422 U.S.

at 604 (confession that came two hours after illegal arrest held to be fruit of the poisonous tree).

As to the second factor, the Court finds that there was no "intervening independent act of a free

will" sufficient "to purge the primary taint of the unlawful invasion,"  *Wong Sun*, 371 U.S. at 486.

During those two hours, Mr. Fisher was under the control of Sergeant Gonzales.  After the initial

seizure, Sergeant Gonzales maintained control of Mr. Fisher.  He raised his voice during the

encounter.  When Mr. Fisher asked to leave, Sergeant Gonzales did not respond; instead,

Sergeant Gonzales ordered Mr. Fisher out of the car and onto his knees.  After the gun was

discovered, Sergeant Gonzales placed Mr. Fisher in detention while he ran an NCIC check, called

for backup, called the Bureau for Alcohol, Tobacco and Firearms, then finally placed Mr. Fisher

in handcuffs and in the back of the patrol car.  Within minutes after Sergeant Gonzales found the

gun, two other law enforcement officers arrived on the scene, for a total of three.  There were no

intervening circumstances that would have purged the taint.

While *Miranda* warnings are a factor to consider in whether the statement was an act of

free will or a product of the illegal detention, *Miranda* warnings "cannot always make the act

sufficiently a product of free will to break, for Fourth Amendment purposes, the causal

connection between the illegality and the confession. They cannot assure in every case that the

27

Fourth Amendment violation has not been unduly exploited." *Brown*, 422 U.S. at 603 (citation omitted). A court must look to the facts of each particular case to determine if a statement was the product of an illegal detention. Notably, in this case, the statement to Agent Jessen occurred while Mr. Fisher was in handcuffs, under arrest, and crying. There were now four officers on the scene. Sergeant Gonzales had already asked incriminating questions of Mr. Fisher. *See Fernandez*, 18 F.3d at 882. The statement to Agent Jessen occurred while Mr. Fisher was under law enforcement control and in duress as a result of his arrest. The arrest does not provide sufficient attenuation. *See United States v. Ienco,* 182 F.3d 517, 528 (7th Cir. 1999) (formal arrest not an intervening circumstance sufficient to attenuate discovery of incriminating evidence).

Therefore, the Court finds that there was no "break in the causal connection between the illegality" and the statement to Agent Jessen. *See id.* at 883.

Because the third factor warrants the same analysis as stated above, the Court finds that the statement to Agent Jessen will also be suppressed.


## CONCLUSION

For the above-stated reasons, Mr. Fisher was arrested, the gun was seized and statements were taken in violation of his Fourth Amendment right to be protected from unreasonable searches and seizures. Therefore, the arrest and the evidence obtained from the seizure are suppressed as fruits of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

IT IS THEREFORE ORDERED that the motion to suppress is hereby **granted**.  The gun

and Mr. Fisher's statements to the law enforcement officers will be suppressed.

Dated this 31st day of August, 2001.


_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE


Attorney for Government
Louis Valencia

Attorney for Defendant
Roger Finzel